**SMITHKLINE BEECHAM CONSUMER HEALTHCARE, L.P., Plaintiff,**

v.

**WATSON PHARMACEUTICALS, INC., et al., Defendants.**

**No. 99 Civ. 9214(DC).**

United States District Court, S.D. New York.

Sept. 10, 1999.

Weil, Gotshal & Manges LLP, New York City, by Helene D. Jaffe, R. Bruce Rich, Bruce S. Meyer, Jonathan Bloom, Elizabeth Forminard, for Plaintiff.

Howrey & Simon, Washington, DC, by Joseph P. Lavelle, David M. Morris, June E. Cohan, Frommer Lawrence & Haug, LLP, New York City, by Barry S. White, James K. Stronski, for Defendants.

## MEMORANDUM DECISION

CHIN, District Judge.

In this case of first impression, plaintiff, the manufacturer of a national brand nicotine gum, seeks to enjoin defendants from marketing a competing generic version of the nicotine gum with "labeling"—an instructional booklet and audio tape—that is "strikingly or substantially similar" to plaintiff's "labeling." Defendants' principal defense to the claim of copyright infringement is that they were required by the Food and Drug Administration (the "FDA") to use "labeling" that was "the same as" the labeling approved for use with the national brand. Plaintiff moves for a preliminary injunction.

For the reasons that follow, the motion for a preliminary injunction is granted. The following constitute my findings of fact and conclusions of law.

### FINDINGS OF FACT

Plaintiff SmithKline Beecham Consumer Healthcare, L.P. ("SmithKline") manufactures Nicorette nicotine polacrilex gum ("Nicorette"), an over-the-counter product for smokers seeking to quit smoking. Nicorette is sold with a "stop smoking plan" that features a user's guide (the "Guide") and an audio tape (the "Tape"). The

Guide and Tape are copyrighted, creative materials. The Guide features graphics and drawings and the Tape features music and actors engaging in dialogue. The Guide and Tape are instructional materials that seek to encourage and guide smokers through the process of reducing their dependence on nicotine to help them in their efforts to give up smoking. SmithKline spent more than one million dollars developing the Guide and Tape, in a process spanning several years. (First Quesnelle Aff. ¶ 11).

Defendants Watson Pharmaceuticals, Inc., Watson Laboratories, Inc., and Circa Pharmaceuticals, Inc. (collectively, "Watson") manufacture a generic or private label version of Nicorette, sold as "Nicotine Gum" or "nicotine polacrilex, USP." Watson's nicotine gum product is intended to compete directly with Nicorette. Watson received approval from the FDA earlier this year to market the product, and it had planned originally to "launch" the product on August 1, 1999. (First Wilkinson Decl. ¶ 10).

The Watson product is accompanied by a user guide and audio tape that are virtually identical to SmithKline's Guide and Tape. The text of the two tapes is identical (except for the product names). Although some of the music on the two tapes is different, some of the music is identical. The text of the two user guides is also identical (except for the names). The graphics in the Watson guide have been changed from the graphics in SmithKline's Guide, but only slightly; for example, instead of the father and a dog found in the SmithKline Guide drawing, a mother and a cat appear in the Watson version.

SmithKline commenced this action for copyright infringement to enjoin Watson's alleged willful and infringing copying of the Guide and Tape. Watson's principal defense is that its user guide and audio tape were part of the "labeling" approved by the Food and Drug Administration (the "FDA"). Watson contends that the Federal Food, Drug, and Cosmetic Act (the "FFDCA") requires that the labeling for a generic drug be "the same as" the labeling approved for the "listed," or brand name, drug, 21 U.S.C. § 355(j)(2)(A)(v), and notes that the FDA regulations broadly define "labeling" to include "all written, printed, or graphic matter" as well as "booklets" and "sound recordings." 21 C.F.R. §§ 1.3(a), 202.1(1)(2). Watson relies heavily on the fact that during the approval process for its nicotine gum, when it submitted proposed text for an audio tape substantially different from the text of the SmithKline Tape, the FDA rejected the proposed text, advising Watson in a letter dated April 16, 1998 as follows:

> The text for your proposed audio is not the same as that for the reference listed drug, Nicorette. . . . Please revise your tape text to be in accord with that of Nicorette.

(DelGaudio Decl., Ex. C).

On July 28, 1999, SmithKline obtained a copy of Watson's guide for its nicotine gum product from the FDA. It did not obtain a copy of a transcript of Watson's audio tape from the FDA until August 24, 1999. (First Quesnelle Aff. ¶ 32). SmithKline commenced this lawsuit two days later, on August 26, 1999.

The same day that suit was filed, unbeknownst to SmithKline, Watson commenced shipments of its nicotine gum product to its retailer customers. Shipments continued through August 28, 1999, and a total of some twenty-two million pieces of gum were shipped by "Next Day Air." (Wilkinson Decl. ¶ 10).

On August 27, 1999, the day after suit was filed, I issued an order directing Watson to show cause why a preliminary injunction should not be issued enjoining it, during the pendency of this action, from selling or shipping its nicotine gum with a user's guide, audio tape, or other packaging insert "strikingly or substantially similar" to SmithKline's Guide and Tape. SmithKline did not request a temporary restraining order at that time. The mo-

tion for a preliminary injunction was made returnable September 15, 1999.

On August 30, 1999, Watson announced that it had "launched" its nicotine gum product. SmithKline learned on September 1, 1999 that Watson had shipped product to four customers (retail chains). (9/2/99 Tr. at 2). Concerned that Watson had commenced or was about to commence shipments, SmithKline requested a temporary restraining order. At a conference on September 2, 1999, Watson agreed to refrain, pending a hearing on SmithKline's motion for a preliminary injunction, from making any additional shipments, without prior notice, and it also agreed to contact its customers to advise them not to place any of Watson's product on shelves pending the hearing.

The return date for the preliminary injunction motion was accelerated to yesterday, September 9, 1999, and a hearing was held. Watson agreed to continue to refrain from making shipments without prior notice and to use best efforts to prevent any sales of its product for a week while I considered SmithKline's motion.

Following the hearing, the FDA submitted a letter to the Court yesterday afternoon (the "FDA Letter") to "provide some context and clarify its position." The FDA explained that while it did initially advise Watson that the generic version of Nicorette had to have the same labeling, later communications from the FDA to Watson clarified that position to address the concern that the Nicorette labeling might be subject to copyright protection. The FDA Letter reported that the FDA had explained to Watson in March 1999 the FDA's view that:

> generic sponsors, like all other sponsors of nicotine-based smoking cessation aids, have discretion to design their own audio support materials. As the [FDA] explained, no formula for the behavioral support materials is effective for every person attempting to quit smoking.

While the [FDA] has requested that sponsors include audiotapes and other behavioral support materials, and reviews such materials prior to authorizing marketing, the [FDA] does not approve the specific words or approach taken. Rather, it is the general concept of providing quitters with a variety of useful support materials that the [FDA] has required.

The FDA Letter also explained that in March 1999 an FDA representative had explained to Watson in a telephone conversation that "the 'same labeling' requirement did not require that the generic's behavioral support materials be identical to the innovator's materials."

In its papers and arguments presented to the Court in opposition to SmithKline's motion, Watson did not disclose any of these communications.[1]

### DISCUSSION and CONCLUSIONS OF LAW

■ To obtain a preliminary injunction, SmithKline must demonstrate (1) irreparable harm in the absence of the requested relief and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor. See Polymer Tech. Corp. v. Mimran, 37 F.3d 74, 77–78 (2d Cir.1994).

### A. Irreparable Harm

■ SmithKline has demonstrated that it will suffer irreparable harm if a preliminary injunction is not issued. In this Circuit, a prima facie case of copyright infringement normally gives rise to a presumption that the copyright owner will suffer irreparable harm. See ABKCO Music, Inc. v. Stellar Records, Inc., 96 F.3d 60, 64 (2d Cir.1996). Here, there is no dispute that Watson copied, almost verbatim, the text of SmithKline's copyrighted

---

1. On the other hand, SmithKline was also made aware of the FDA's position, by letter dated March 15, 1999, but SmithKline failed to advise the Court of this communication.

Guide and Tape. If Watson's interpretation of the FFDCA and the FDA regulations is wrong and it did infringe on SmithKline's copyrights, then SmithKline presumptively suffered irreparable harm.

Moreover, presumptions aside, the record contains concrete evidence of Smith-Kline's irreparable harm. SmithKline spent several years and more than one million dollars developing a creative Guide and Tape that are an important part of the Nicorette product and an important component of the brand image that SmithKline has sought to create. The introduction into the market of virtually identical user guides and instructional tapes is likely to confuse consumers and threaten consumer goodwill. *See Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 37 (2d Cir.1995); *Fisher–Price, Inc. v. Well–Made Toy Mfg. Corp.,* 25 F.3d 119, 124 (2d Cir.1994). While it is true, as Watson argues, that there is no separate market for the guides and tapes, the guides and tapes are a critical part in the marketing of the product and their role cannot be minimized. SmithKline will suffer irreparable harm if they are wrongfully copied.

**B.  *The Merits***

■ As to the merits, the parties agree that this is a case of first impression. They are aware of no case involving copyrighted, instructional "labeling" of the kind at issue here, where the manufacturer of a generic drug was required by the FDA to use instructional "labeling"—a guide book or audio tape—that was "the same as" the previously FDA-approved instructional labeling of the "listed," or national, brand. In view of the arguments presented, and in the limited time I have had to consider the issues, I cannot conclude that SmithKline has demonstrated a likelihood of success on the merits.[2]

2.  As a factual matter, however, the FDA Letter strongly undercuts Watson's factual prem-

Clearly, however, at a minimum Smith-Kline has demonstrated sufficiently serious issues going to the merits to make them a fair ground for litigation. The case presents significant issues involving the interplay between the Copyright Act and the FFDCA. SmithKline argues forcefully that the FFDCA cannot have the effect of repealing the copyright laws and that the FFDCA cannot nullify its rights under the copyright laws. *See Watt v. Alaska,* 451 U.S. 259, 267, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981) (noting that courts must read two federal statutes "to give effect to each if [it] can do so while preserving their sense and purpose"); *cf. Practice Management Info. Corp. v. American Med. Ass'n,* 121 F.3d 516 (9th Cir.) (use by Health Care Financing Administration of copyrighted medical procedure code in Medicaid reimbursement regulations did not render copyright invalid), *cert. denied,* —— U.S. ——, 118 S.Ct. 339, 139 L.Ed.2d 263 (1997), *opinion amended by* 133 F.3d 1140 (9th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 2367, —— L.Ed.2d —— (1998); *CCC Information Servs., Inc. v. Maclean Hunter Mkt. Reports, Inc.,* 44 F.3d 61 (2d Cir.1994) (copyrighted compendium of used car valuations did not fall into public domain merely because the information was incorporated into insurance laws of several states), *cert. denied,* 516 U.S. 817, 116 S.Ct. 72, 133 L.Ed.2d 32 (1995). Meritorious issues exist as to the meaning of "the same as," particularly in the context of creative instructional materials, and as to whether Watson's instructional materials could have been drafted to comply with the FDA regulations without violating SmithKline's copyrights.

**C.  *Balancing of the Hardships***

■ Finally, I find that a balancing of the hardships tips decidedly in Smith-Kline's favor.

ise for its position.

As noted, SmithKline spent more than one million dollars and several years developing its Guide and Tape. These are creative, instructional materials that are intended to assist smokers in their struggle to stop smoking. They are relied upon by consumers, and the Guide and Tape are important to SmithKline's efforts to market Nicorette. Indeed, millions of boxes of Nicorette have been sold with the Guide and Tape, and SmithKline has spent in excess of $200 million in bringing Nicorette to market and developing a brand image. (Supp. Quesnelle Aff. ¶ 9). Moreover, the consumer confusion and loss of goodwill that would result from the use by Watson of a user's guide and audio tape virtually identical to SmithKline's Guide and Tape would be significant. In the absence of a preliminary injunction, Watson—a direct competitor—would be able to misappropriate SmithKline's copyrighted creative materials to reach the same target consumers.

On the other hand, Watson also would suffer substantial financial losses if its launch of the product is delayed and it is required to revise its guide and tape. SmithKline has enjoyed many years of exclusivity, and Watson has now been given the right, after much effort, to market a generic version of Nicorette. Finally, the availability of a generic option will benefit consumers.

On balance, I find that the equities weigh decidedly in favor of SmithKline. Any harm that Watson would suffer by the issuance of a preliminary injunction is largely the result of its own doing. When suit was filed, Watson apparently had just started shipping product, and the "harm" then would have simply been a delay in the launch. Yet, rather than mitigate its damages, Watson chose to go ahead and continue to ship some twenty-two million pieces of gum even though it was aware of the lawsuit. See Cherry River Music Co. v. Simitar Entertainment, Inc., 38 F.Supp.2d 310, 323 (S.D.N.Y.1999) (recall order was appropriate in part because party opposing motion for preliminary injunction "deliberately sailed in harm's way" by continuing to manufacture and ship infringing product after receiving cease-and-desist letter).

In addition, Watson clearly should have made more of an effort to address the copyright issue with the FDA. (See Pape Decl. ¶¶ 5, 6). Watson's claim that it was forced by the FDA to copy the text of the SmithKline Guide and Tape verbatim is, at minimum, a gross exaggeration, as the FDA Letter shows that the FDA explained to Watson in March 1999, both orally and in writing, that the "same labeling" requirement did not require the generic "behavioral support materials" to be "identical" to the "innovator's" materials.[3] There are many different ways that a manufacturer can express the ideas used in SmithKline's Guide and Tape,[4] and Watson certainly could have proposed some different language in its user guide and tape to avoid problems of copyright infringement. Yet, Watson made no effort to do so, apparently because it was content to copy—verbatim—SmithKline's Guide and Tape, knowing that they were copyrighted.

The harm suffered by both SmithKline, in the absence of a preliminary injunction,

3. Watson submitted an affidavit from its Director of Regulatory Affairs and Product Development, which purports to lay out the history of the FDA's approval of the labeling for the nicotine gum product. The affidavit does not, however, set forth the communications between the FDA and Watson—which include a telephone conversation between the Director and an FDA representative—whereby Watson was advised by the FDA that "the same as" did not mean "identical." Rather, Watson took the position in its papers submitted to this Court that it was a "fact" that "the [FDA] required Watson to use precisely the labeling that it is using." (Def. Mem. In Opp. at 2) (emphasis added).

4. In the nicotine "patch" market, which is somewhat analogous because the "labeling" for patches also includes instructional materials and user guides, the materials vary greatly in terms of format, layout, typeface, and text. (First Quesnelle Aff. ¶ 26 & Exs. C, D, E).

and Watson, on the granting of a preliminary injunction, would be compensable, to some degree, by monetary damages. But Watson's harm (the loss of sales revenue) is more easily recompensed monetarily than SmithKline's harm (the loss of goodwill and consumer confusion), and, as noted, Watson's harm is largely the result of its own actions.

### CONCLUSION

Accordingly, SmithKline's motion for a preliminary injunction is granted, and defendants are hereby enjoined, during the pendency of this action, from selling or shipping its nicotine gum with a user's guide, audio tape, or other packaging insert "strikingly or substantially similar" to SmithKline's Guide and Tape. Defendants are also hereby ordered to recall any nicotine gum packaged with a user's guide, audio tape, or other insert "strikingly or substantially similar" to SmithKline's Guide and Tape.

SmithKline shall submit a proposed order, on notice, within five days hereof. SmithKline's request for attorneys' fees and sanctions will be deferred until after the litigation has been resolved on the merits.